Argument not to exceed 20 minutes per side. Mr. Paulson, you may proceed. May it please the Court, I'm Coulter Paulson from Squire Patton Boggs and the Sixth Circuit Clinic at the UC and NKU Chase Schools of Law. Here on behalf of Dr. Trotter, we split the time ten minutes each and I'd like to reserve three minutes in rebuttal. As a matter of law, the pain injections of lidocaine and dexamethasone that were testified to by Dr. Hawkins that she gave to patients constitute nerve blocks under the Medicare regulations. Dr. Trotter was sentenced to 15 years in jail for fraudulent nerve blocks because the government convinced the district court and the jury otherwise. The government also in this appeal to defend the sentence confuses the idea of a conviction with fraud with the calculation of loss. In fact, they make the same argument that they did in the Mahmoud case, which a panel of this court, they argued in Mahmoud, testimony at trial established that Medicare would not have paid any of Mahmoud's claims, including legitimate ones, if Mahmoud had disclosed this fraudulent scheme. That's their argument here. And a panel of this court in Mahmoud adopted the test in Medina, which is an Eleventh Circuit case. And they held that you have to look at the fraudulent bills and you have to give credit for legitimate claims. In Medina... And who bore the responsibility for putting that proof in? I'm thinking of our Washington case from 2013 that talked about if the government's evidence is sufficient to show an impropriety, then the burden shifts. And the burden goes to those defendants to come forward with evidence, at least by a preponderance of the evidence, that the services were actually rendered and medically necessary. I'm struggling to find that in the record. Your Honor, that's a great question. And I think the government itself provides, the government's witnesses, rather, provides the answer to that. Here, they brought on one doctor from Dr. Trotter's clinics, which was Dr. Hawkins. And she testified that she gave eight to ten nerve blocks per patient. Well, she didn't call them nerve blocks, right? She called them pain shots. But she testified that she gave these nerve blocks because they were in pain, and she gave them, they were appropriate. And she thought those didn't count as nerve blocks, but they were nerve blocks under the regulation. And so the government's own witness testified that her nerve blocks were legitimate. And the government used that. They said, well, look, she said she didn't give any nerve blocks. And then they brought in thousands of pages of medical records, and they said, and therefore, because these nerve blocks never happened, none of the other thousands and millions of dollars of claims ever happened. And so the only evidence in the case, it's from this one doctor about nerve blocks, is that they were given. It seems to me that that's sort of segregating a particular piece of testimony and ignoring sort of the overall proof in the case. I mean, the overall proof in the case, it seems to me, supports a finding that Dr. Trotter's business was not really the practice of medicine. His business was the fraud he was going about. Your Honor, in a case like this, so a lot of the cases are like that, right, where they have empty rooms and things didn't happen. You know, they're billing for patients that weren't there or the patients were there because they were getting money to be there. This isn't that case. In those cases, they always put on an expert, and the expert always says, you know what, I reviewed these, they weren't medically necessary, they weren't, you know, they have experts to testify about this. The government didn't put on any expert. They put on, not a single one, they put on Dr. Hawkins, she testified what she did about the nerve blocks, and then they put on summary agents who said, you know, I listened to their testimony, I listened to the testimony of four patients, they all said they didn't give nerve blocks as defined by Dr. Hawkins. But didn't they also put on evidence about, I know there were very few patients in the indictment, I express some concern about that, but look at Cusman, that that patient said that the claim was that she had received seven nerve block injections from Dr. Hawkins on the dates, but Cusman herself denied receiving injections. She denied even seeing Dr. Hawkins in her life. These patients are patients who were, who gave inconsistent testimony. Well, is that a jury question? Well, then it becomes a question for the government. The government put on Dr. Hawkins, who testified that she saw Mrs. Cusman and that she gave the nerve blocks to, the pain shots to Mrs. Cusman, and then Mrs. Cusman gets up and says, and she says, I'm worried about losing my Medicare benefits based on this testimony. She says, I've never heard of this doctor in my life. So if Cusman was right, then the government suborned perjury from Dr. Hawkins. But then we're back to the same position. Where are you in the shifting burden of proof? Because credibility, honesty, capability of testifying, all of those are credibility and jury questions, weighing the evidence. We've talked about this CPT manual, and I understand that, but my question for you is, did Dr. Trotter put in the CPT manual and make that argument? So, Your Honor, the CPT manual was not entered in the trial, but the government prosecuted Dr. Trotter for, and if you look at the jury, if you look at the jury verdict, for not giving nerve blocks. That was the healthcare fraud, was nerve blocks. They prosecuted him, and if they're going to prosecute somebody for not giving nerve blocks, and then they argue, it's their burden to argue the law correctly. And we stood up. When they put on Dr. Hawkins, we stood up and said, she's wrong. She has no idea what she's talking about. And then we put on Dr. Trotter, who testified, you know, quoting from the manual. We didn't put in the manual. And the government says, well, look, you could have put on better proof. But we're talking, this is an issue of law, of whether the regulation was. Yeah. The law of your argument, but you're almost out of time, and I'm curious. I'm not real clear what you're arguing. Are you arguing a sentencing claim or a conviction claim? We're arguing both. We focused on the sentencing. For the last ten minutes, what have you been arguing? This is a sentencing claim. It's a sentencing claim. It is, because. So the standard under sentencing is different from the standard under conviction. It's a clearly erroneous kind of review, right? Is that right? Well, that's right. So if bad things were going on, and if you're arguing a sentencing claim, you've got to assume that they're properly convicted for purposes of the sentencing claim. Then there was a conspiracy. There was an effort to hide. And the question is, how much loss should be attributed to them? That's the sentencing issue. That's the sentencing issue, which is the bulk of your brief, and what you've said is the bulk of your argument. So on the sentencing issue, focusing on that for the moment, because it seemed part of the time like you were arguing the merits of whether the jury should have convicted it. It had that tone to my ear, let me put it that way. It had that tone to my ear, too, because I was about to ask that question as well. Okay. So it must have been a good question if Judge Gibbons was about to ask it. Let's think of it in terms of a sentencing claim, which means they're guilty for purposes of that. Which means, just to interrupt for one second, which means they're guilty of the $3,000 of fraud here in New York. No, there's a conspiracy claim in there, too, right? There is a conspiracy claim. And the conspiracy as presented was that there was this huge attempt to have, I don't want to, I don't know, sort of sham companies, right? That's the second. Yeah, the second. There are two conspiracies. That's the second conspiracy. But that says something about how you're calculating loss when you have a conspiracy to hide what's going on, all right? If you have a conspiracy that's elaborate and set up and convicted, that they're hiding what's going on, then when you're estimating the amount of loss, it would seem to me logical for the court, under clearly erroneous deference, to say this much is the amount, and not just the amounts of the three people that were used as exemplars. What's wrong with that? I mean, as a matter of figuring out how much we're going to punish you within the statutory range, we're going to say it was a lot more than that because there was this huge cover-up, which you wouldn't have had for three individual people. So to bring it back one level, the method that they used to calculate loss, that's reviewed de novo. Factual findings are reviewed for clear error here. And now to kind of move back to your question, if we look back to the cases of Mahmoud and Medina, they had broad fraud in those cases. And at sentencing you say, we'll take it that there was fraud occurred. But then they said, but look, you have to look at it. To quote from Medina, Medina said, they reviewed the record and they said there's not sufficient evidence that any of the prescriptions were not medically necessary. In this case, we didn't have that testimony. They didn't put on the expert. Dr. Hawkins didn't say what she did was not medically necessary. And they didn't find issues that were not delivered to the patients. The policy problem here is the government can't come in and say, look, you put the wrong doctors on here. Because that's what the conspiracy is, is wrong doctors on the things and the wrong addresses. You can't do that and say, and that makes every claim into fraud. That's what those claims represent. The cases that do support the government's position, the Triana, the Hebron. Triana, they're diversion cases. I think that you're done answering Mr. Rogers' question. All right. Thank you very much.  May it please the Court. My name is Paul Stablen, and I represent Elaine Lovett. And she is the biller, as alleged, in the indictment. I'd like to reserve three minutes for rebuttal, if I could. To pick up where Mr. Paulson left off, and I think because it applies to both Ms. Lovett and also to Dr. Trotter, because the same amount, if we're going to jump to sentencing, was affixed by the court, speculatively, from our perspective, as each defendant. And that speculation, the court just landed on a number, without analyzing anything in regard to the amount of claims that were legitimate, or that could have been legitimate, because the prosecution had put forth no, the government had put forth no expert testimony, as Mr. Paulson just said. To make a determination as to all of these thousands and thousands and thousands of pages of claims of over 1,000 patients for a number of years, and to say that they were all not provided, there were services that were not provided, and services that were not medically necessary, the two foundations for any fraudulent claim, the government never did that. And it's their burden to establish that. The fraud, as defined by the, there's a note in regard to the comment as, I believe it was Mahmoud that had said, the court should look at, get to that, the Sentencing Guidelines 2B1.1, the comment there, comment note 3F8, which talks about aggregating the dollar amount of the fraudulent claims. The court in sentencing never made, it just adopted what was provided by the government, which is the total amount of claims that went, not only claims that were encompassed in the dates of the indictment, but the claims were also part, as I pointed out in my reply brief, claims that were prior to, claims that were submitted to Medicare that were prior to the dates of the indictment, and took every last one of them. All of the claims data is in large Excel spreadsheets, and you can hit the sum button and just total them all up at the end, and that's exactly what the government did and said there's $26 million in claims that were submitted without establishing the fraud. All were under the pre-review where everything was denied? The government is saying correct. All of them were. All of them because of the fact that at the time that Dr. Trotter was placed on pre-payment review. Pre-payment, thank you. Yes, it's the pre-payment review status, and then so all of the claims that were submitted through companies that were established after he was placed on pre-payment review. And without establishing whether or not the services were provided or the services were not medically necessary, not provided. But this was part of the, I mean this is a dual conspiracy case. You have the first one to do this improper action, and then you have the second one for once you're on pre-payment review to create all these other entities, right? Yes, but I would like to say that the pre-payment review is not an exclusion. It doesn't say that you're not entitled to be paid for the services that are rendered. Pre-payment review is simply. But then when it picked them up, every one of them that it looked at, it denied. It denied everything. They denied everything but without any understanding as to whether or not the services were actually provided. Then the question becomes what happens? Whose burden is it? Once the government has said you are on pre-payment review, we want your documentation. And that's what they did. And your two clients gave them documentation, which the government looked at and said this is not good enough. We are not paying this claim. So where I'm struggling is I understand that there is a pretty significant issue with how clear the proof was to expand it out. But I'm struggling with Washington's requirement that once the government has gotten over the initial proof burden, then it becomes the burden of the defendants to come forward, only by a preponderance of the evidence, and show that they rendered services. Then I'm looking at the pre-payment review claims that were submitted, that following the resubmittal with more information, the government and the evidence before us shows that all of those were denied. If you were to see the testimony of the patients who all testified, they were actual patients. Yes. They saw Dr. Trotter. They were treated by Dr. Trotter. They were treated. They were there. But you know you've got claims submitted that are in the record that show, for example, submission for psychotherapy under the name of a Dr. Duca, who was a thoracic surgeon, not a psychotherapist. You've got bills for Dr. Hawkins for chiropractic care, when she didn't do that and she didn't even have privileges at the hospital. So it's not a dead record. I mean, there is information in there about bills that were submitted. I just want you to help me understand what became your job, the job of Dr. Trotter and Ms. Lovett, once all of that information was in, and you had a record that the pre-payment review, when additional documents were submitted, they were inadequate. So then what's your role as far as showing the propriety of the services rendered? I believe, and this is the argument that I made at trial, that from the very beginning when the government sought to admit these records, is that they weren't relevant. And the government is dismissing my relevance argument, saying how could it not be relevant. We're talking about the evidence that the court is addressing, and I appreciate it. It's such a small percentage of the entirety that was admitted, and that was my objection at trial, is the fact that all of these claims that were admitted were not proven to be fraudulent. And if they're not fraudulent, they can't be relevant to the jury's determination of guilt. Would you concede that all of the records showing a pre-payment review on which your clients submitted subsequent documentation and were still denied, would you not concede that that's evidence of improper billing? It may be. It doesn't mean it's fraudulent. That's the point, Your Honor. On all of them? But the government has the burden of establishing that they are fraudulent, not the defendants. As I read the transcript of your client's sentencing, you did not seek to meet the burden that Judge Stranch has described. Instead, you chose to focus exclusively on what import should be drawn from the government's evidence. Is that correct? You didn't present any evidence. Correct. What you chose to do at the sentencing hearing was basically present an argument that's very much along the lines of the one you've made today. Well, I am the attorney that was there, and I have to accept the record that's been presented. And I can say that I still adhere to the premise that the prosecution, the government has the burden of establishing at least some larger percentage of the entirety of the claims. That's $28 million. I think we've got it. Thank you. Good morning, and may it please the Court. My name is Tom Tynan, and I represent the United States in this matter. The primary argument raised by the defendants in their appeal, which is that a single line of testimony from one of the government's 17 witnesses at trial was both so vital and so flawed, is plagued by a fundamental mischaracterization of the government's prosecution theory at trial. At trial, the evidence showed that Dr. Trotter's first three original practices, Grace, Southfield, and Trotter Medical Services, had all been placed on prepayment review by Medicare. As Judge Strange pointed out, 100% of those claims, every single one, had been denied during prepayment review by Medicare, which means that the documentation that Dr. Trotter and his billers submitted to support those claims was insufficient to justify the bills that they had submitted to Medicare. Okay. I understand that, but I am also struggling with the fact that this is a case in which you have four patients testifying as a representative sample of over 1,000 patients, four patients from one doctor as a representative sample of over 1,000 patients from 20 different doctors. You did not have an expert that testified as to the relationship, as to how that was a representative sample and would enable you to show fraud throughout the whole 1,000 patients, did you? So, no, Your Honor, it's correct that we did not have an expert, but I think that... Don't most of those cases from Medicare have that very expert testimony that enables you to say, we've given you a representative sample and this expert tells us that that is representative. The information from these people are sufficient to provide proof of the entire conspiracy. I mean, isn't that the normal methodology? So, I can't say whether or not most cases involve that expert testimony, but what I can say is that that is certainly something that would be expected when the only allegation in the case is that the services that were billed were medically unnecessary or had not been provided. Now, that was not the only allegation in this case. That was not the only allegation in the indictment. Indeed, a great amount of the government's case in chief dealt with what the defendants did after all of those claims had been denied. The second. The second part of the fraud. Let me ask you how you think you fit under our Jones case from 2011 where the government offered 210 patient files, but the expert didn't testify specifically that all those files accurately represented all the other files in the case. If that's the standard, wouldn't your case be reversible under that standard? I don't think that would be applicable to the case that we have here and the case that we proved in trial. Why not? That's because under this court's decision in Triana where the court affirmed the district court's finding that because the provider was ineligible to receive Medicare payments to begin with, the district court was under no obligation to subtract the value of any purported Isn't that a little bit different? There's already been a determination that that person has engaged in fraud and he or she is on the list. You can't apply. You can't ask the government for money anymore. You are off the list. But here we have people who were on the list to be paid and submitted bills. So what is your proof burden in that circumstance? I would agree with Your Honor in the sense that in Triana the provider was excluded. In this case, the provider was on prepayment review, and I would agree that those two circumstances are different. But what makes Triana applicable here is that the practical effect of what Dr. Trotter and Elaine Lovett did in this case also made Dr. Trotter ineligible to receive payments from Medicare because rather than going through the prepayment review process and billing his claims through his personal practices. The same entity. The same entity. They created a web of practices. What is your best case for saying that that subsequent conspiracy is sufficient to entail for sentencing purposes everything before the date of the first conspiracy and the indictment to the end of the practice? I'm not sure I'm tracking Your Honor's question, but I think Triana would support the government's theory of loss in this instance where the court found that you did not need to subtract the value of any purported legitimate services. But that's because he had already been decided to be un- he did not have the opportunity to submit bills. Here we've got people who have the opportunity, but help me understand what is it about the second conspiracy, either in law or in your argument, that would say it would work sufficiently that you can be punished for everything you submitted to Medicare? Well, I think there are two things really. And the first is that it's a conspiracy to defraud Medicare in the sense that it's a conspiracy to avoid Medicare's efforts to prevent fraud. And the evidence that was put on in this part of the case was very powerful when it spoke to both defendants' intent. We had Adam Barnett as a witness at trial, and he testified at Record 156, page 2202 through 228. And there he talked about five companies that were created, called the Administrative Management Solutions Companies. Four of them only had P.O. boxes, no physical location. And they had cell phones as a registered number, not landlines. None of the owners on paper were physicians or providers. Instead, you had an owner of one of the companies who was 21 years old. You had another owner who was convicted for welfare fraud, had declared bankruptcy, and who identified, in the end, Dr. Trotter as a coastliner on the lease, which led Medicare to sort of unraveling this conspiracy. You had people like Benita Mitcham, who was an administrative employee of one of the companies, who was sick and never performed any business functions for one of these companies. You had one of the defendants' own son, his wife, agreed to become an owner on paper. And then her own son was a massage therapist, led to believe that they could use the company to see physical therapy patients. But the defendants billed Medicare for nerve block injections through that company. So... Doesn't this go, I mean, isn't the larger point that's being made here  that the government, in fraud cases, is able to prove an aggregate amount, and it need not be precise, you're supposed to do the best you could do to put it in sort of lay terms. And then the burden shifts for the defendants to show, if they choose to, that all of the loss was indeed not attributable to the fraud. And in this case, the decision was made not to shoulder that burden, but rather to argue about the sufficiency of the government's proof in the first place. That's exactly correct, Your Honor. Under comment, I think it's 3F8 to 2B1.1 of the guidelines, states that the total amount of fraudulent bills is prima facie evidence of intended loss in health care fraud cases. And so the defendants obviously have, and it says, if not rebutted, which means, and can be interpreted to mean, that defendants can come forward and say, no, no, no, that's not right. Look, here is, for example, I'm throwing out examples of what could have been done. Here is specific testimony where certain services were provided. That specific amount, the Hebron case from the Fifth Circuit talks about this, should be deducted from the total loss amount. That rule, though, is not unique to health care fraud cases. I think the specific guidelines section that I am talking about is. . . I agree with that, but the point is that that rule about loss appears in many contexts in which a court is trying to apply the sentencing guidelines. That's correct. They're typically fraud contexts, but it's identity theft, whatever it is. That's correct, Your Honor. Does it matter that there were two conspiracies here? Am I remembering right, they think that there was $10 million in the first one and $14 million or $15 million in the second? Sue, I wouldn't phrase it as two conspiracies. I would say it's two different parts of one overarching conspiracy, and it's really important to keep that in mind. That's a different concept. It's really important to keep that in mind because what could have been done here, which the defendants didn't do, was say, okay, I've been put on prepayment review. My documentation has been found to be insufficient. So I'm going to work to improve my documentation, to improve my recordkeeping, but I'm going to continue to submit claims to Medicare through my own practices. What they instead chose to do was to circumvent that process completely. That suggests, and I would submit the jury found, that questions the claims that are being submitted by all these other entities to begin with because they would have had the opportunity to submit those claims through Trotter's original three practices, but they chose not to. And they chose not to because they weren't actually providing the services. If they had been actually providing the services, there would have been documentation to submit to Medicare during the period. Well, we do know that Dr. Hawkins was providing some of it. She testified. I did this, but I didn't do that. So she testified. I was going in. I was seeing patients. I was doing. I know there's this issue with nerve blocks, but she was saying I was doing these shots for patients. So you're correct in that Dr. Hawkins did say that she did meet with patients. She did administer some services, including— But all of her services that were billed were treated as part of the conspiracy for the purposes of sentencing, correct? That's correct, Your Honor. And there's a couple of reasons for that, which is because they didn't actually bill the services, which she said that she had been providing at trial. They billed for nerve block injections. They billed for— Well, then we have that problem with the CPT manual that shows that the numbers they billed for were nerve blocks that did not require fluoroscopy. And so it is a different category. But tell me why that doesn't matter. So it doesn't matter for a couple of reasons. The first of all is the CPT manual is a snapshot of one year during a six-year conspiracy. Second of all, the defense— But it does—you would have to concede that it does show that there are nerve blocks, a whole category of nerve blocks, that do not require the description of fluoroscopy and the long-time provision. And during that time frame, they were nerve blocks subject to payment from Medicare. So I would agree with Your Honor that the description of what that one page the defendants have submitted on appeal does say what Your Honor just suggested. But there are a lot of problems with interpreting that to mean that their nerve blocks were actually provided in that case, which is because— I understand. And this is the issue with submitting this one page on appeal where there hasn't been the opportunity to explore this at trial. And the reason for that is, again, it's a one-year snapshot. Codes change over the years, as Dr. Trotter admitted in one of his own civil deposition transcripts that we submitted at evidence at trial. How far back—I understand your argument. How far back do you take the position the amounts could be calculated for the purposes of sentencing? Before the indictment all the way back as far as you have records? So the claims—and this was one point that I did want to respond to that defense counsel for Ms. Leavitt raised, which is that the claims preceded the date alleged that the conspiracy began. And that is not true. He cited two examples, one of which was Gray's Family Health, and I think the other one was for Trotter Medical Services. And I think where maybe there's confusion is that the dates that the claims were actually submitted were all during the conspiracy period. But where it might be confusing is that they were submitted for dates of service that predated. They were predated. Exactly. So they were all bills submitted during the time frame of the conspiracy. So you're representing that everything that is calculated in the 25 million figure for the purposes of sentencing were for bills submitted during the time frame charged in the indictment. Correct, Your Honor. That's my understanding of the record. That's my understanding of the evidence that we put on at trial. And when Mr. Stout did raise that issue in his brief, I went back and looked at the exact exhibits. For Gray's, which is Government Exhibit 100, and for John Trotter Medical Services is Government Exhibit 103. And so you can see in the spreadsheets the dates of the bills submitted. And I went back and looked, and I did see that those claims were submitted during the time frame. Could I bring you back to the beginning of your argument where you addressed what you took to be the thrust of your opponent's brief about that sentence from Dr. what's her name? Hawkins. Hawkins. Is that what it was? Yes. All right. When I read that in the briefs, it sounded kind of persuasive. What caused me thereafter in reading more to be not as persuaded as I couldn't figure out whether it was an argument that was going to conviction or whether it was going to sentencing. It was a little unclear to me. When you were answering it there, were you answering it on the theory that it was a sentencing issue or a guilt issue? In our briefs, Your Honor? When you got up and said, I'm going to answer the main thing that they're arguing. Did you view their argument? Were you answering it in the context of a sentencing issue or in the context of a conviction issue or just sort of generally? I do agree with Your Honor that the defendants have framed this argument as a sentencing issue. The way I could see it possibly as a sentencing issue is that it's sort of colored. I'm not sure it's a very precise legal argument that it's easy to put your hand on exactly where it fits and what you have to look at. But just sort of generally speaking, it supports the idea, if you accept it, that more than the defendants are being credited for, they gave services that were properly compensable under the system. And the suggestion is that the kind of services they gave were kind of the less extensive nerve blocks rather than the more extensive nerve blocks and that what the government is doing is sort of equivocating over what a nerve block is. In one part of their case, they say a nerve block is this big, huge thing and these big, huge things never happened. And then in another part of their case, they are suggesting that nerve blocks could be very little things. And if that's so, and I want to ask you whether it's so, but if it's so, then it at least provides sort of a background suggestion that there was a lot of services being provided. Where another reading of the record is not much services were provided and this was all pretty much of a hoax. And it does seem, they point out certain parts of the record, it does seem like the government's theory is twofold. Nerve blocks are a big deal and nerve blocks are not a big deal. And you started out saying, well, there's a theory of the government's case and the theory of the government's case is that nerve blocks are a big deal or they're not a big deal. Are you with me? I am with you, Your Honor. And I think, so I'm hesitant to say that they weren't a big deal because we obviously focused on them and that's because we focused on them because Medicare had put Dr. Trotter on prepayment review because of his aberrant billing of nerve block injections. Those were nerve blocking injections that required all of those precautions and time and were dangerous. Or is it, in your previous sentence, when you used the word nerve block injections, which kind of nerve, were you talking about nerve block injections sub one or nerve block injections sub two? And so this goes to the defendant's point, which is that they never put on expert testimony about whether or not these services were medically necessary, et cetera, et cetera. And the simple fact is we didn't have to. Now you're talking about sentencing. Well, I understood. I just want to be clear what we're talking about. We're talking about sentencing now, right? Correct. I can see your argument, well, it doesn't matter, it's not a big deal, but I want to know what the theory of the government is. Not that the jury could have thought one of either thing and still come to its conclusion because we're talking about sentencing now. Correct. And the theory of the government was that these injections weren't provided. And that theory. There's at least some indication that there was provision of things that were not very elaborate. It's like her testimony was, I did a lot of little stuff, but I never did these big elaborate things. And that, what she was talking about, she said, I gave, I see that my time is up. I understand, but I'd like you to answer my question. There were these two drugs, I don't know the drugs, and vitamin B12. I'm not talking about vitamin B12. And they're long polysyllabic drugs that I can't pronounce. Were those, on the government's theory of the case, using the words as the government uses them, were those nerve blocks or not? They were not. And I believe what Your Honor is referring to is the topical pain shots that Dr. Hawkins admitted on the stand, and the government elicited from her during trial that she had provided. And if you looked at the page, no matter what the time period for the page applied, if you look at that page, would those have been nerve blocks on that page, those topical things? It's hard for the government to say in sort of isolation from everything else that's been presented at trial as to whether or not those would have qualified for the procedures that the defense is now saying were actually given. But their position at trial was, we haven't billed. There's the, I understand it's a one page, but what Judge Rogers is asking you is, we've got this page that says at the top, nerve block. Then it lists 64400 all the way down to 64479. All of those do not include that extensive treatment. And your opposing counsel's position is, we only billed for those that under this code do not require the extensive treatment. So isn't the answer to your question that that's what the billing was for, what Dr. Hawkins described she did? So what Dr. Hawkins described, and it's important to look at the testimony that defendants are pointing to, the exact line of testimony, which is that a certain type of nerve blocks require fluoroscopy. She didn't say that all nerve blocks require fluoroscopy. She said specific type, and that's lumbar spine. Generously, that may be true, although the question from the government was, and I quote, explain to the jury what a nerve block is. And then you explained the nerve block fluoroscopy that began on 6479, and none of the ones above. I'm sorry, this is Judge Rogers' question. I don't want to interrupt, but I think it needs to be said that their claim is they didn't bill for the others. They billed for the first ones. So that theory is wholly implausible in light of all of the other evidence that came in during the government's case in chief. Well, I thought they looked at the numbers on the bills, and those were the numbers. Specifically relating to Dr. Hawkins' testimony, and I'll point the court to two lines of her testimony that are extremely powerful and totally debunked the new theory that is now being proposed by defendants, which is that Dr. Hawkins gave all of these nerve blocks, and she just didn't know that she was doing it. That is the logical conclusion of what they are suggesting to the court, and they are suggesting that to the court even though they also suggest that Dr. Trotter was a doctor who wanted to wean beneficiaries off of pain pills, and he wanted to do that by administering these nerve block injections. So they are suggesting to the court that Dr. Trotter hired these physicians to give nerve block injections, but the physicians didn't even know they were doing it, and that was effective for his purposes. That is wholly implausible, and what happens when Dr. Hawkins learned that services were being billed under her provider number? She confronted both defendants. Elaine Lovett said, Did you tell Medicare on Dr. Trotter? Not, Oh, you don't really understand the services that you're giving. What did Dr. Trotter say? Just because you don't know doesn't mean you're not guilty. Not, Oh, wait a second, Dr. Hawkins, you don't understand that you're actually giving nerve block injections. That was not what the defendant said. That was the testimony, and that testimony has gone unrebutted from the defendants in this case. Again, note that I'm out of time. You are out of time, and I think we've deviated from a sentencing argument to a, I mean, not through any fault of your own, but I think we're talking about the overall evidence in the case at this point. We'll hear from the defendants' counsel in regard to that. Thank you, Your Honor. Your Honor, I have a number of points. I'll move through them quickly, and some of these, the same issue, we believe, infects both the trial and the sentence, so I'm not going to try to separate them here. Well, the argument you make here is the sentence. But we are focusing on the sentence. But you have sort of wrapped in things that happened at trial. That's right, and part of the reason for that, Your Honor, is because the district court, if you read the denial for the acquittal motion, it says, look, they didn't give a single nerve block, and they billed for 14 plus million of them. I can't acquit this because you never gave a single nerve block, and that informed the district court's sentence. It made it so he couldn't get a fair trial. So go back, though, to the denial. Stick to the sentencing issue, and the sentencing issue is really much more a procedural issue than it is anything else, in my opinion at least. I agree. So to the prepayment review point, all of them were denied. Dr. Schroeder testified they sent them in. There was no rebuttal to that. They were denied because they didn't receive documents. They said they didn't review a single document on the prepayment review, and so they denied all of them. So they weren't denied. Initially, did he not then turn around and actually submit documentation? He did. And then they were denied again. But they were never reviewed, and he hired an attorney to ask why, and he never found out why. So on the policy, their argument here, if a hospital misrepresents its ownership, which would be fraud, but if a hospital misrepresents its ownership, under their theory, every service provided by the hospital becomes a loss. In fact, they can get that on their theory without putting on one doctor. They don't even need Dr. Hawkins testimony. They don't need four patients. They can count $26 million of loss without a single. And that's kind of the policy of the sentencing here. Now, you're really seeking to challenge evidentiary rulings at trial. I mean, if they're permitted to introduce the summaries they introduced, the evidence is there, and why isn't the burden yours? Because the sentencing issue is were legitimate services rendered? And the spreadsheets don't say a thing about whether... All they are is claims. They don't say anything about whether services were rendered. The jury has found your clients guilty. The government has used some of the trial testimony to establish an amount of loss. If that's not the right amount of loss, it's incumbent upon you to show it. And our argument was they conceded at sentencing that there was $3,000 worth of loss for those three patients, or $100,000 depending on how you do it. And they say, and we're conceding that. And for sentencing, we concede that because that was the jury's verdict. But that doesn't mean... Your time is up. One last piece. Your time is up. All right, thank you. If we can focus on sentencing, because I think that's what we're trying to do. But unfortunately, they are intertwined because you have to use testimony from the trial, obviously. Well, they're intertwined because of the nature of your argument. Yes. But in sitting through this trial, as I did, and participating in the trial, the thrust of the government's argument was the nerve blocks. It wasn't anything else. The government has now said in their response that, well, there is this argument that the sham companies were set up. But the sham companies do not equate to loss for sentencing purposes. There may have been the argument, irrespective of the nerve blocks. But if you understand the way that the questioning went... Let me backtrack. All the witnesses that were called by the government who were patients, the four patients who testified, testified that they didn't receive any shots with long needles. And that was the thrust of the questions that the government posed to these patients. They all said that they were treated. They all said that they received pain shots, except Ms. Kruseman, who said that she did not. But the others did testify that they did receive pain shots, which is consistent with what their own witness said, and Dr. Hawkins said the same thing. But what the government argued, and used that argument then to promote their argument at sentencing, is that the fact that no nerve blocks were performed on any of these patients, and therefore no nerve blocks were ever performed on any of them, without any explanation to the court at the time, is what a nerve block is, or what it fell under. May I back up from that just one question? If the proof showed that five new entities were created and billed, and four of them had no physical location at all, isn't that correct, that anything billed by those four entities with no physical location had to be fraudulent? All of it, all of it. A lot of it gets to the process of billing, which Ms. Lovett did testify in her defense, that there are methods that Medicare instructs their billers to do, and that is when one doctor is... You bill under a certain pin for a particular doctor at one location where that doctor may be, but another doctor could be at another location and provide services at a different location, and that is because that doctor is unavailable or that doctor is not providing those services on that particular day, or whatever it is. And those are modifiers that are put onto the Form 1500. She testified... Can I ask you this? Do any of the government summaries show the billing associated with the sham companies? I believe some of the summaries did break it down by... Okay, and what would that figure be, the total of the sham companies' billing? It's in an exhibit, Judge. I apologize, I don't have that number off the top of my head. Well, you would have to concede that amount, not just the $3,000, wouldn't you? But I don't... It doesn't mean just because it was billed under that company that the services weren't provided. It doesn't mean... Well, there's evidence in the record that those companies weren't providing any services, that they were sham, isn't there? Or at least very strong evidence from which the jury could find that. I mean, the owners of the companies weren't equipped to give any services. But if you submit the claim and you put in a modifier, which is Q5 or Q6 modifiers, which is telling Medicare the doctor that the services are being billed under is not the doctor that provided the services, and here's the address, another box, where the services were provided. That was a significant part of the argument that put guilt aside, argument that these services were actually rendered. I could ask a question that follows up on that, though. Isn't it a logical... Or is it or is it not a logical inference that if the nature of the fraud is to continue to create entities that are not subject to prepayment review, an inference permissible that they wouldn't be able to survive prepayment review? Because it would seem to me like if they were able to survive prepayment review, they would submit it for that review rather than creating a new company that doesn't have to go through prepayment review. Prepayment review significantly delays payment for services that are being rendered. And Dr. Trotter had a number of doctors that worked for him. He had bills that he had to pay. It doesn't mean that the services weren't rendered. Right, but if you're creating companies so that you won't have to go through it, I might suggest that to a juror. To a juror. We're trying to focus on sentencing. All right, fair enough. Okay, your time is up. We thank you all for your argument. We'll consider the case carefully. Mr. Staplen, if I was pronouncing that correct, I note that you were appointed to represent Ms. Lovett under the Criminal Justice Act. We appreciate very much the service you've rendered and your very careful and effective advocacy on her behalf. Thank you all.